IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

DEBORAH CREECH, as surviving   *
spouse of Guy Doyle Creech,    *
                               *
     Plaintiff,                *
                               *
     v.                        *    CV 416-011
                               *
ONEBEACON AMERICA INSURANCE    *
COMPANY,                       *
                               *
     Defendant.                *

O R D E R

Presently before the Court is Defendant's motion for summary judgment. (Doc. 34.) The Clerk of Court gave Plaintiff timely notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 38.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied. Plaintiff filed a response and sur-reply brief, and Defendant filed a reply brief as well as a response to Plaintiff's sur-reply brief. (Docs. 43, 48, 50-1, 51.) The time for filing materials in opposition has expired, and the motion is ripe for consideration. Upon consideration of the record evidence, relevant law, and the parties' respective briefs, Defendant's motion is **GRANTED**.

## I. BACKGROUND

On September 17, 2012, Mr. Guy Doyle Creech approached Gate Four of the Georgia Ports Authority ("GPA") terminal located in Garden City, Georgia, in a tractor-trailer. (Doc. 43-1, at 3.)[1] After having his tractor-trailer weighed, Mr. Creech attempted to queue for the interchange where vehicles are inspected prior to being allowed to enter the port. (Id.) Prior to reaching the interchange, however, he came alongside a tractor-trailer being operated by Mr. Craig Watson. (Id.; Doc. 43-3, at 20-21, 67-68.) Mr. Watson – believing that Mr. Creech was attempting to cut him off and skip ahead in line – stopped and exited his vehicle. (Doc. 43-3, at 20-21, 67-68.) Mr. Watson approached Mr. Creech's vehicle, slapped the driver-side door, and instructed Mr. Creech to wait his turn. (Doc. 43-1, at 3; Doc. 43-3, at 20-21, 67-68.) Mr. Watson then stepped onto the running board beside Mr. Creech's door and punched him in the face through his open window several times before jumping back

---

[1] In its filings, Defendant argues that Mr. Creech's unsworn statements to law enforcement officials contained in various police reports constitute hearsay, are otherwise inadmissible, and therefore cannot be considered on a motion for summary judgment. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." (internal quotations citations omitted)). In response, Plaintiff argues that these statements are admissible pursuant to the "excited utterance," "records of a regularly conducted activity," "public records," and/or "residual" exceptions to the rule against hearsay. See FED. R. EVID. 803, 807. Defendant has also filed two motions to exclude the testimony of two proposed expert witnesses, namely Dr. Edmund Donoghue and Mr. Michael Schiavone, Esq. (See docs. 28, 37.) Because Plaintiff's claims fail on their merits regardless of the admissibility of the aforementioned statements/testimony, the Court has considered the statements/testimony for the purpose of providing the factual background.

down to the pavement.[2] (Doc. 43-1, at 3; Doc. 43-11, at 1.) Mr. Creech then grabbed a wooden stick with a metal end-cap (colloquially known as a "tire-knocker") from his truck cabin and exited his vehicle. (Doc. 43-1, at 3.) Upon exiting his vehicle, Mr. Creech struck Mr. Watson in the head with the tire-knocker. (Doc. 43-1, at 3; Doc. 43-3, at 20-21.) Mr. Watson then punched Mr. Creech several times in the head and/or face before returning to his vehicle and entering the interchange. (Doc. 43-1, at 3; Doc. 43-3, at 26-27.) Mr. Creech then returned to his vehicle, pulled behind Mr. Watson's vehicle as it was being "interchanged," and yelled for the interchange clerk to detain Mr. Watson until law enforcement personnel could be summoned; despite this request, however, Mr. Watson was interchanged and allowed into the port.[3] (Doc. 43-1, at 3-4.) Mr. Creech subsequently returned home. Later that same night, however, Mr. Creech's condition deteriorated, and he was transported and admitted to Memorial Health University Medical Center in Savannah, Georgia, early on the morning of September 18, 2012. (See Docs. 43-13, 43-14.) On September 20, 2012, Mr. Creech suffered a stroke which eventually led to his death on

---

[2] Mr. Watson denies stepping onto the running board of Mr. Creech's vehicle or punching him in the face at that time. (Doc. 43-3, at 24-25.)
[3] After their altercation, Mr. Creech spoke with GPA law enforcement officials; while he gave statements to several officers, he declined medical attention and stated that he did not wish to press charges or secure a warrant against Mr. Watson. (Doc. 43-1, at 3-4; Doc. 43-11, at 1.) Mr. Watson was also interviewed by GPA law enforcement officials and similarly declined to press charges against Mr. Creech. (Doc. 43-5, at 1; Doc. 43-11; see also Doc. 43-10.)

September 27, 2012. (See Doc. 43-14; Doc. 43-15, at 25; Plaintiff's Statement of Material Facts ("PSMF"), Doc. 44, ¶¶ 3-4.)

On the date of the altercation, the tractor-trailer operated by Mr. Creech was owned by Mr. Gary T. Parker and leased by Mr. Parker to Evans Delivery Company, Inc. (Doc. 43-17, ¶ 2.) Mr. Creech was not directly employed by Mr. Parker or Evans Delivery Company, but rather had an oral agreement with Mr. Parker that he would operate the tractor-trailer as an independent contractor and would split the profits earned by Mr. Creech's operation of the vehicle with Mr. Parker.[4] (Id. ¶¶ 3-4.) Prior to the altercation, Defendant issued an Occupational Accident [Insurance] Policy to Evans Delivery Company, namely Policy No. 216-001-164, effective February 1, 2012 (the "Policy").[5] (PSMF ¶ 15; see also Doc. 35-4.) Subject to the Policy's terms, conditions, and exclusions, it provided, *inter*

---

[4] Mr. Parker attested that the financial arrangement between himself and Mr. Creech was as follows: "On a weekly basis [Mr. Parker] would receive a check from Evans Delivery Company, Inc. Evans would deduct from the check: (a) Fuel Costs; (b) Premiums for Mr. Creech's Occupational Accident Policy; and (c) Liability Insurance. After these deductions, [Mr. Parker] would give Mr. Creech 50% of the net proceeds and out of [Mr. Parker's] 50% [he] would pay for property insurance on the vehicle as well as any required maintenance." (Doc. 43-17, ¶ 4.)

[5] More specifically, the Policy identifies the "Policyholder" as the "Transportation Industry Trust" and the "Participating Organization" as "E F Corporation [d/b/a] West Motor Freight of PA and Evans Delivery Company, Inc., as a participant in the Transportation Industry Trust." (Doc. 35-4, at 2, 27.) The Policy states that it "is a legal contract between the Policyholder and the Insurer" whereby "[t]he Insurer agrees to insure Eligible Persons of the Policyholder, for whom premium is paid, against loss covered by this Policy, subject to its provisions, limitations and exclusions." (Id. at 2.) Section I of the Policy delineates two classes of persons who are "Eligible Persons," namely: "Owner-Operators" and "Contract Drivers." (Id. at 4-5.)

4

*alia*, an accidental death benefit (including a survivor's benefit) as well as an accident medical expense benefit. (PSMF ¶ 17; see also Doc. 35-4, at 10-17.)

Shortly after the altercation, Plaintiff contacted Defendant seeking recovery under the Policy. On or about August 26, 2014, a third-party claims administrator, Brentwood Services Administrators, Inc., sent Plaintiff a letter in which it stated that no benefits were payable under the Policy and further reserved Defendant's rights and coverage defenses thereunder. (Doc. 43-16.) Plaintiff initiated the instant action on December 9, 2015 in the State Court of Effingham County, Georgia, Case No. ST15CV203RT, seeking to recover benefits allegedly owed to Plaintiff under the Policy (*i.e.*, breach of contract) as well as penalties pursuant to O.C.G.A. § 33-4-6 for Defendant's alleged bad faith refusal to pay such benefits. (See Doc. 1-2.) On January 11, 2016, Defendant removed this action to this Court.[6] (See Doc. 1.) On October 3, 2016, Defendant filed its present motion for summary judgment.

---

[6] On January 13, 2016, Defendant moved to stay the instant proceedings and compel Plaintiff to engage in arbitration pursuant to the Policy's mandatory arbitration provision and 9 U.S.C. § 3. (Doc. 5; see also Doc. 35-4, at 22.) On February 16, 2016, the Court denied Defendant's aforementioned motion, concluding that the Policy's arbitration provision was unenforceable under O.C.G.A. § 9-9-2(c)(3) and 15 U.S.C. § 1012(b). (See Doc. 11.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259, 1260 (11th Cir. 2004); FED. R. CIV. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted).

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating that there is indeed a genuine issue as to the material facts of its case. Clark v. Coats &

Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . [only] if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Matsushita, 475 U.S. at 587. The Court must also avoid weighing conflicting evidence. Anderson, 477 U.S. at 255; McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). Nevertheless, the non-moving party's response to the motion for summary judgment must consist of more than conclusory allegations, and a mere "scintilla" of evidence will not suffice. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990); Pepper v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). "The non-moving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Bryant v. Dougherty Cty. Sch. Sys., 382 F. App'x 914, 917 (11th Cir. 2010) (citing Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986))).

7

## III. DISCUSSION[7]

Under Section I of the Policy ("Eligibility, Effective Date and Termination Date"), two classes of persons are eligible for coverage under the Policy, namely: (a) "Owner-Operators;" and (b) "Contract Drivers." (Doc. 35-4, at 4-5; see also PSMF ¶ 18.) To qualify as an Owner-Operator, an individual "must lease to or from the Participating Organization" (here, Evans Delivery Company, Inc.) and must, *inter alia*: (i) have a valid and current commercial driver's license; (ii) own or lease a power unit; (iii) be responsible for maintenance of the power unit; and (iv) be responsible for maintaining physical damage insurance on the power unit. (Doc. 35-4, at 4; PSMF ¶ 19.) To qualify as a Contract Driver, an individual must, *inter alia*: (i) have a valid and current commercial driver's license; (ii) "be authorized by an Owner-Operator or motor carrier to operate

---

[7] The parties dispute which state's substantive law should apply to the resolution of this dispute; Plaintiff asserts that Georgia law applies, while Defendant argues that the law of the District of Columbia applies. In support of its conclusion, Defendant asserts that the Policy was "made and delivered in the District of Columbia" and notes the "Policyholder" is defined in the Policy as the "Transportation Industry Trust," the trustee of which is located in Washington, D.C. (Doc. 35-4, at 2, 27; see also id. at at 2 ("This Policy is governed by the laws of the state in which it was delivered."); id. at 23 ("This Policy and the coverages thereunder are governed by the laws of the jurisdiction where the Policy is delivered.").) As noted by Plaintiff, however, the Policy does not actually state its place of delivery (see Doc. 35-4), and the parties have failed to provide any evidence resolving this factual issue. Plaintiff also argues that Defendant has waived any objection to the application of Georgia law to the present dispute by its failure to address the choice of law issue in relation to its motion to compel arbitration. (See Doc. 43, at 11-12; see also Docs. 5, 8.) Notably, while insisting that the law of the District of Columbia applies, Defendant has also supplied "relevant Georgia law in case this [C]ourt finds that the law of Georgia controls." (Doc. 48, at 2.) For the purposes of its present analysis, the Court has assumed – without deciding – that the substantive law of the State of Georgia controls.

a power unit owned or leased by an Owner-Operator (The Contract Driver must neither own nor lease the power unit)"; (iii) not be an employee of the Participating Organization; and (iv) not be an employee of the Owner-Operator. (Id.)

Because Mr. Creech did not own or lease the tractor-trailer he was driving at the time of the incident, Mr. Creech is not an Owner-Operator as defined by the Policy.[8] (See Doc. 43-17, ¶ 2 ("In 2012 [Mr. Parker] owned a 1996 Freightliner, which [he] leased to Evans Delivery Company, Inc. [Mr.] Creech drove this truck.").) Similarly, because Mr. Parker did not have a commercial driver's license and therefore does not qualify as an Owner-Operator under the Policy, Mr. Creech does not fall within the Contract Driver class as defined by the Policy; the Policy requires that Contract Drivers be "authorized by an Owner-Operator or motor carrier to operate a power-unit *owned or leased by an Owner-Operator.*"[9] (Doc. 35-4, at 4 (emphasis

---

[8] Even if the arrangement between Mr. Creech and Mr. Parker could be considered a lease of the tractor-trailer, Mr. Creech would still fail to qualify as an Owner-Operator because, *inter alia*, he was not responsible for the maintenance of – or maintaining physical damage insurance on – the vehicle; rather, Mr. Parker was responsible for these matters. (See Doc. 43-17, ¶ 4 ("On a weekly basis [Mr. Parker] would receive a check from Evans Delivery Company, Inc. Evans would deduct from the check: (a) Fuel Costs; (b) Premiums for Mr. Creech's Occupational Accident Policy; and (c) Liability Insurance. After these deductions, [Mr. Parker] would give Mr. Creech 50% of the net proceeds and *out of [Mr. Parker's] 50% [he] would pay for property insurance on the vehicle as well as any required maintenance.*" (emphasis added).)

[9] Plaintiff makes several unavailing arguments against this conclusion. First, Plaintiff argues that what the aforementioned Policy language "is intended to mean is clarified in a parenthetical sentence that follows: '(The Contract Driver must neither own nor lease the power unit.)'" Yet to reach the conclusion proffered by Plaintiff would require the Court to wholly ignore the first sentence in favor of the sentence following it, a result clearly not intended by the contracting parties given that they chose to leave the

9

added); see also Doc. 35-5, ¶ 11 ("[Mr. Parker] did not and do[es] not have a commercial driver's license.").) To find otherwise would require the Court to rewrite the terms of the Policy and strip Defendant of its authority to bargain for the terms of its insurance coverage obligations - neither of which this Court is willing to do in the absence of evidence showing this result is contrary to the contracting parties' intent. Plaintiff has failed to make such a showing. Accordingly, because Mr. Creech did not satisfy the relevant criteria to be eligible for coverage under the unambiguous terms of the Policy, Plaintiff is afforded no coverage thereunder.[10]

Plaintiff, however, argues that Defendant has waived - or is otherwise estopped from raising - any claim that Mr. Creech was not eligible for coverage under the Policy. Specifically,

---

first sentence in place. Next, Plaintiff argues that the term "Owner-Operator" is not defined in the Policy; this argument is directly contradicted by Section X of the Policy ("General Definitions"), which explicitly defines "Owner-Operator" as being "as described in SECTION I." (See Doc. 35-4, at 26.) Similarly, Plaintiff's argument that "[t]here is nothing in the requirements for a Class II 'Contract Driver' that the Owner-Operator possess a [commercial driver's license]" is unavailing given that the Policy's definition of "Contract Driver" utilizes the previously-defined term "Owner-Operator" and there is nothing in the Policy to indicate that the underlying criteria of that defined term were not intended to apply when used in the definition of "Contract Driver." (See id.; see also id. at 25 ("Contract Driver is as described in SECTION I.") Finally, Plaintiff's argument that the Court's present conclusion "defies common sense" because "the Policy would only cover persons who drive for individuals who own or lease the truck and who also have a [commercial driver's license]" is disingenuous given that Plaintiff has provided no evidence to indicate that this result was contrary to the contracting parties' intent.

[10] Because Mr. Creech - and by extension, Plaintiff - was not eligible for coverage under the Policy, Plaintiff is precluded from recovering bad faith penalties and attorney's fees under O.C.G.A. § 33-4-6. See Fed. Ins. Co. v. Nat'l Distrib. Co., 417 S.E.2d 671, 676 (Ga. Ct. App. 1992) ("Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and there is a disputed question of fact." (citations omitted)).

Plaintiff asserts that, because Defendant has not previously asserted that Mr. Creech was not eligible for insurance under the Policy and has failed to refund the Policy premiums paid on behalf of Mr. Creech, Defendant has implicitly treated the Policy as valid and enforceable and has waived any defense thereto. (See Doc. 43, at 14-16.) In support, Plaintiff cites a line of cases from Georgia for the proposition that, where an insurance company asserts that an insurance contract is void due to fraud in the inducement, the insurer can be estopped from rescinding the policy "if it did not act promptly, upon learning of the fraud, to rescind the contract but instead treated it as valid and enforceable." Lively v. Southern Heritage Ins. Co., 568 S.E.2d 98, 100-01 (Ga. Ct. App. 2002) (citing Columbian Nat. Life Ins. Co. v. Mulkey, 91 S.E. 106, 108 (Ga. 1916)); see also Florida Intern. Indem. Co. v. Osgood, 503 S.E.2d 371, 373-74 ("If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. Otherwise, he can not avoid or rescind such contract. One significant reason for this rule in insurance cases is that leading the insured to believe the validity of the policy is not questioned lulls the insured into not purchasing other insurance and thus subjects the insured's property to continuing non-coverage." (citations omitted)). Notably, "the failure to return premiums is a factor

to be considered in determining whether an insurance company has waived the defense by treating the policy as an enforceable contract." Id. at 101.

Here, the evidence of record shows that while Defendant's investigation of the incident began in September 2012, Defendant did not learn of the facts relevant to the instant coverage determination issue (i.e., that Mr. Parker did not hold a commercial driver's license at the time of the altercation) until September 12, 2016.[11] (See Doc. 35-5.) Plaintiff has put forth no argument – let alone evidence – contradicting this finding. It is also noteworthy that the letter dated August 26, 2014 sent from the third-party claims administrator to Plaintiff informing her of Defendant's intent to deny coverage under the Policy specifically notes that Defendant "expressly reserves all of its rights and defenses." (Doc. 43-16, at 4.) And while it is true that Defendant has yet to refund the premiums paid on behalf of Mr. Creech, Defendant has offered to do so in

---

[11] On May 13, 2016, Defendant issued a subpoena to Mr. Parker requesting records relevant to the instant dispute. (See Doc. 25, ¶ 1; see also Doc. 25-1.) Despite several follow-up letters sent by Defendant's counsel to Mr. Parker, Mr. Parker failed to timely respond to the aforementioned subpoena. Accordingly, on July 7, 2016, Defendant filed a motion to compel Mr. Parker to produce the relevant records. (Doc. 18.) For reasons not relevant to the instant discussion, the Court subsequently denied this motion to compel without prejudice on August 22, 2016. (See Doc. 24, at 1-2.) On August 24, 2016, Defendant filed a renewed motion to compel against Mr. Parker, which the Court subsequently granted. (See Docs. 25, 26.) On September 12, 2016, Defendant filed a "notice of resolution of discovery dispute," notifying the Court that its counsel had met with Mr. Parker that same day and that Mr. Parker had provided documentation and other information responsive to Defendant's subpoena at said meeting. (Doc. 29; see also Docs. 29-1, 35-5.) On October 3, 2016, Defendant filed its present motion for summary judgment (i.e., twenty-one days after learning that Mr. Parker does not hold a commercial driver's license). (Doc. 34.)

accordance with the Policy's terms. (See Doc. 35, at 10 n.2; see also Doc. 35-4, at 4 ("If the Insured Person pays premium but is not eligible for coverage or does not qualify for benefits under this Policy, We will refund any premium paid in error.").) Accordingly, the Court concludes that, as a matter of law, Defendant has not waived its defense that Mr. Creech was ineligible for coverage under the Policy.[12]

## IV. CONCLUSION

Upon due consideration, Defendant's motion for summary judgment (doc. 34) is **GRANTED**. The Clerk is directed to enter **JUDGMENT** in favor of Defendant on all of Plaintiff's claims, **TERMINATE** all other pending motions, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 28th day of June, 2017.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[12] Having concluded that Mr. Creech - and by extension, Plaintiff - was not an insured under the Policy, the Court need not reach Defendant's arguments that: (a) the altercation was not an "Accident" as defined under the Policy; (b) Mr. Creech's death was not a "Covered Injury" as defined under the Policy; (c) coverage is otherwise excluded by one or more Policy exclusions (i.e., the "stroke," "provoked attack," and/or "crime/assault" exclusions); or (d) Plaintiff is not entitled to avail herself of the remedies provided under O.C.G.A. § 33-4-6 because the Policy is allegedly governed by the substantive law of a jurisdiction other than the State of Georgia.